```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,        .
                                       .  Case Number 21-cr-88-2
 4              Plaintiff,             .
                                       .
 5         vs.                         .
                                       .  Washington, D.C.
 6    NATHANIEL DEGRAVE,               .  May 10, 2023
                                       .  10:09 a.m.
 7              Defendant.             .
      - - - - - - - - - - - - - - - - -
 8

 9              PUBLIC TRANSCRIPT OF SENTENCING HEARING
                      (SEALED PORTION REDACTED)
10          BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                    UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

13    For the United States:     JESSICA ARCO, ESQ.
                                 United States Department of Justice
14                               950 Pennsylvania Avenue Northwest
                                 Washington, D.C. 20003
15

16    For the Defendant:         WILLIAM SHIPLEY, JR., ESQ.
                                 Law Offices of William L. Shipley
17                               P.O. Box 745
                                 Kailua, Hawaii 96734
18

19

20

21    Official Court Reporter:   SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
```

```
 1                      P R O C E E D I N G S
 2          (Call to order of the court.)
 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal
 4      Action 21-88-2, United States of America versus Nathaniel
 5      DeGrave.
 6          If I can have counsel please approach the podium and state
 7      your names for the record, starting with the United States.
 8              MS. ARCO:  Good morning, Your Honor.  Jessica Arco
 9      appearing on behalf of the United States.
10              THE COURT:  Good morning, Ms. Arco.
11              MR. SHIPLEY:  Good morning, Your Honor.  William
12      Shipley on behalf of defendant Nathaniel DeGrave, who is present
13      in court.
14              THE COURT:  All right.  Good morning, Mr. Shipley and
15      Mr. DeGrave.
16              THE DEFENDANT:  Good morning, Your Honor.
17              THE COURT:  All right.  So we are here for sentencing,
18      and I have reviewed the final presentence report and
19      recommendation.
20          Oh, we also have Officer Gavito.  Good morning, Officer
21      Gavito.
22              PROBATION OFFICER:  Good morning, Your Honor.
23              THE COURT:  I have also read the parties -- in
24      addition to the presentence report and recommendation, I've read
25      the parties' sentencing memoranda and exhibits, including all
```

1    the letters submitted on behalf of Mr. DeGrave.  I've reviewed

2    the exhibits multiple times in this case, the detention hearing

3    for Mr. Sandlin and for Mr. Sandlin's sentencing and now for

4    Mr. DeGrave and Mr. Colt, who I have later today.  I've also

5    read the victim statements.

6        Ms. Arco, I take it you've made the videos available and

7    will do so to the public?

8            MS. ARCO:  Absolutely, Your Honor.

9            THE COURT:  All right.  And I've reviewed the

10   government's 5K motion, the defense's response, the government's

11   request for financial accounting, and the defendant's response.

12       Ms. Arco, other than through their statements, the 302s, do

13   any of the victims seek to be heard today?

14           MS. ARCO:  No, Your Honor.

15           THE COURT:  All right.  Have I missed anything,

16   Ms. Arco, Mr. Shipley, in terms of what I should have reviewed?

17           MR. SHIPLEY:  No, Your Honor.  I think the Court has a

18   complete record for the purposes of today.

19           THE COURT:  Okay.  Do you agree, Ms. Arco?

20           MS. ARCO:  I agree, Your Honor.

21           THE COURT:  All right.  Mr. Shipley, have you reviewed

22   the final presentence report with Mr. DeGrave?

23           MR. SHIPLEY:  We have, Your Honor.

24           THE COURT:  I notice you did not provide any

25   objections.  You have listed some semi-objections but more

1    clarifications, in your words, in the sentencing memorandum.

2        But am I correct that the presentence report is factually

3    accurate and there are no legal objections to the guideline

4    calculations?

5            MR. SHIPLEY:  Correct.  I think it fairly captures the

6    factual basis for the offense, and the guideline calculations

7    were agreed upon between the parties in the plea agreement and

8    accurately reflects those as well.

9            THE COURT:  Okay.  Mr. DeGrave, did you carefully

10   review and read the PSR and discuss it with your attorney?

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  Did you have enough time to correct any

13   errors in the report?

14           THE DEFENDANT:  Yes, I did, Your Honor.

15           THE COURT:  And is it accurate?

16           THE DEFENDANT:  Yes.

17           THE COURT:  All right.  Ms. Arco, any objections other

18   than the ones that appear to have been addressed by the final

19   PSR?

20           MS. ARCO:  That's correct, Your Honor.  I believe most

21   of our objections or clarifications have been resolved and

22   reflected in the final PSR.  I believe there had been some

23   discrepancies regarding whether Probation was affording him

24   negative 3 for acceptance of responsibility, but that also

25   appears to have been resolved.

1          THE COURT:  Okay.  All right.  So I will review the

2    guideline calculations on the record here.  I've independently

3    calculated them and believe they're correct.  But they are in

4    line with what the parties recommended in the plea agreement.

5    Correct?  Both sides agree with them?

6          MS. ARCO:  Yes, Your Honor.

7          MR. SHIPLEY:  Yes.

8          THE COURT:  Okay.  As far as the findings of fact go,

9    I will adopt the final presentence report as my findings of fact

10   under Rule 32.

11          Turning to the guideline calculations, they are on pages --

12   beginning on page 14 and continuing through page 17.  There was

13   a footnote in the government's brief regarding the fact that the

14   guidelines calculations for Count 3 were omitted from the

15   report.

16          But as I understand it, both parties agree that the proper

17   guideline for that offense, which is assaulting, resisting, or

18   impeding certain officers, was 2A2.2 and the base offense level

19   is a 14.  The official victim enhancement is 3A1.2, results in a

20   plus 6, and the obstruction, destroying documents enhancement is

21   plus 2.  So together, that's a total offense level of 22.

22          So I will add -- I'm not going to have Probation supplement

23   that report, but I note for the record I have also calculated

24   those guidelines as well, and it makes no difference in terms of

25   the guideline calculations that apply here.  As reflected in the

1    PSR, the base offense level for this offense is 14.  We have

2    enhancements, specific offense characteristics of a plus 8, and

3    that applies because it was an obstruction of the administration

4    of justice.  In addition, there's plus 3, substantial

5    interference with the administration of justice, and plus 2 for

6    the planning, as well as plus 2 for the obstruction of justice

7    after the offense.

8         All of this results in an adjusted offense level of 29, and

9    with three levels off for acceptance, we're at a level 26 and a

10   criminal history category I.

11        Everyone agrees with that?

12             MS. ARCO:  Yes, Your Honor.

13             THE COURT:  Guideline range of 63 to 78 months.

14        In addition, the government has moved for a reduction in

15   Mr. DeGrave's sentence based on his cooperation, and that is a

16   five-level; is that right, Ms. Arco?

17             MS. ARCO:  That's correct, Your Honor.

18             THE COURT:  Five-level reduction, for a guideline

19   range of 37 to 46 months; correct?  And Mr. Shipley has asked

20   for a further variance or additional reduction for Mr. DeGrave's

21   cooperation.

22        All right.  Let me go ahead and hear initially from the

23   government.  I don't -- unless you really want to play them,

24   Ms. Arco, I don't need to watch the videos again.  But if you

25   want to play a brief snippet of one or two, I will allow you to

1    do so.

2                MS. ARCO:  Sure, Your Honor.  Thank you.

3         Your Honor, first, as a matter of procedure, the government

4    referred to ten video exhibits and three paper exhibits in its

5    sentencing submission.  I understand you just referred to them

6    and have reviewed them.  We would like to formally ask that

7    those be introduced into evidence.  I understand the defense has

8    no objection.

9                THE COURT:  Any objection, Mr. Shipley?

10               MR. SHIPLEY:  No, Your Honor.

11               THE COURT:  All right.  Those exhibits are admitted.

12               MS. ARCO:  Thank you.

13        I won't repeat the entirety of our sentencing memorandum in

14   my allocution, and I will pair down the video exhibits because I

15   know you have reviewed them.

16        Our memo explains in detail why the sentencing guidelines,

17   the 3553(a) factors, and Mr. DeGrave's cooperation support the

18   government's recommended sentence.

19        What I would like to do today is to share a few videos that

20   illustrate his actions and show why the government's recommended

21   sentence, specifically 37 months of incarceration, is

22   appropriate.

23        To briefly summarize, Your Honor, Mr. DeGrave's violence

24   and aggression in aid of his goal of breaching the Capitol and

25   distinguishing himself from those who are, quote, all talk, in

his words, resulted in the successful breach of the Capitol by
dozens, if not hundreds, of other rioters, as well as the breach
of the Senate Chamber itself.  He assaulted numerous law
enforcement officers that day to achieve his ends.

He also traveled in a car full of gear and weapons to D.C.
across the country from Tennessee, ready for and seemingly eager
to perpetrate violence, and that's exactly what he did on
January 6.

On this point, I wanted to clarify what I found to be a bit
off the mark in the defense sentencing memo.  They wrote that
"DeGrave was unaware Colt had brought the firearm."  That's on
page 4.  This is a bit misleading.

In his Statement of Offense, Mr. DeGrave admitted that he
and his co-conspirators, quote, discussed shipping guns to
Sandlin's residence in Tennessee, where they would all meet
before driving to D.C.  Colt said he would try to fly with his,
quote, G43, a reference to a Glock 43 pistol.  Sandlin later
stated he was bringing his, quote, little pocket gun and a
knife.  That's all in Mr. DeGrave's Statement of Offense,
paragraph 13.

In the same paragraph, he also admitted that Colt shared a
picture of his recent purchase of a Glock holster in the group
chat, in the Facebook group chat.  And he further admitted to
seeing Sandlin's Facebook post which depicts Mr. Colt lying in a
hotel bed in Memphis, Tennessee, with a gun in his hand before

1    arriving in Washington, D.C.  That's in paragraph 16.

2        The government believes that this slight misunderstanding,

3    misrepresentation of the facts in the defense sentencing memo

4    stems from Mr. DeGrave's prior statement that he did not recall

5    physically seeing the two guns brought by Mr. Colt and

6    Mr. Sandlin during the trip, but that on the evening of

7    January 5, Colt and Sandlin confirmed to him that they had each

8    brought a gun with them on the trip.  That's paragraph 18 of the

9    Statement of Offense.

10        I just wanted to confirm that all the context pointed to

11    the fact that they brought their guns.  They literally told him

12    that they brought their guns.  So it wasn't like he had no

13    inclination that they were bringing guns to Washington, D.C.  So

14    I wanted to make that clear.

15        Among what makes this case so disturbing, Your Honor, is

16    that Mr. DeGrave was discussing with Mr. Sandlin and Mr. Colt

17    hours before anyone ever breached the Capitol the idea of

18    storming the Capitol.  So he didn't just follow the crowd, and

19    you can't blame his actions on the mob mentality.  He didn't

20    just follow everyone and walk into the Capitol.

21        In the TGI Friday's and then later at the World War II

22    Memorial, as you have seen in Exhibit 2, Mr. DeGrave decided

23    that breaching the barricades and storming the Capitol was a way

24    to achieve his end of stopping the steal, even if part of the

25    rhetoric was perhaps amplified to put on a good show for the

1    camera.  This fact alone sets him worlds apart from most

2    January 6 defendants.

3        I also wanted to highlight a statement by Mr. DeGrave on

4    January 6 that says out loud what I think most -- many January 6

5    defendants were thinking that day.  As he has admitted in his

6    Statement of Offense and as captured in one of the GoPro videos,

7    as he was walking away from the Capitol with Mr. Colt, it's a

8    very -- I didn't submit it to Your Honor.  It's just a black

9    screen, because the GoPro clearly had been put like in a

10    backpack of some sort but was still recording.  So we just hear

11    the audio of a conversation between Mr. Colt and Mr. DeGrave.

12        And Mr. DeGrave tells Mr. Colt, "In two hours, we're gonna

13    hear a decision.  They won't reject it if they know what's good

14    for them."  This statement explicitly acknowledges the intent,

15    his intent to intimidate and coerce our elected officials into

16    rejecting the results of a presidential election, risking our

17    entire democratic process -- system in the process.  I was

18    floored when I came across this evidence, Your Honor.

19        I was going to play Exhibit 2, the short clip of

20    Mr. DeGrave chatting by the World War II Memorial with the

21    walkie-talkie, but again, just to summarize --

22            THE COURT:  You can go ahead.  I don't want to totally

23    redo your allocution.

24            MS. ARCO:  No, no, it's okay.  I'll try to be brief.

25    Because I know you've watched it, I'll just summarize.

1    He's chatting with someone over the walkie-talkie and

2  noting that people are, quote, going through the barricades.

3  Again, this shows that Mr. DeGrave -- it shows him planning to

4  storm the Capitol building, because Mr. Sandlin's at his side

5  saying it's time to occupy the Capitol, they're going through

6  the barricades, and they keep marching on.

7    Granted, this again was at Mr. Sandlin's urging.  He

8  clearly was the thought leader of this group.  But it shows that

9  even before he reaches Capitol grounds and sees the mob as a

10  part of the mob mentality, that he's planning to do this.

11    Exhibit 3, which Your Honor has reviewed, was recovered

12  from Mr. DeGrave's cell phone and shows Mr. Sandlin scaling some

13  dismantled bike barricades along the perimeter of the Capitol

14  grounds and Mr. DeGrave's commentary, "We're going in."

15    Exhibit 4, which you've watched, illustrates Mr. DeGrave's

16  intent immediately before he stormed the Capitol.  He viewed

17  himself as a, quote, true patriot while lamenting the so-called

18  armchair warriors who are all talk and not prepared to do what

19  he eventually did to stop the steal.

20    We concede that some of this was for the camera.  But as

21  his private dialogue with his co-conspirators and his subsequent

22  violent actions show, the sentiments he expressed were real and

23  led him to commit the offenses to which he has pled guilty.

24    It should be noted again, at the time he made that video

25  and stormed the Capitol, he had a large can of bear mace in his

1    pants pocket, as was submitted in the government's sentencing

2    memo itself.

3         And I will just briefly play Exhibit 4, which is a brief

4    clip.

5         (Video played.)

6         MS. ARCO:  And as Your Honor has seen from the video

7    exhibits played during Mr. Sandlin's sentencing hearing, which

8    were also submitted in advance of this hearing, Mr. DeGrave and

9    his co-conspirators then proceeded to scale the stairs under the

10   scaffolding and storm the Capitol building, just as Mr. Sandlin

11   suggested hours before anyone had actually done so.  They

12   immediately entered the Rotunda and then a lobby area just

13   inside the Rotunda Doors.

14        As the surveillance footage shows, Mr. DeGrave joined the

15   Sparta-like push against the three U.S. Capitol Police officers

16   who were guarding those doors against the mob, which resulted in

17   the breach of those doors, which were external doors, and that

18   action, Mr. DeGrave's joint action with his fellow rioters

19   allowed dozens, if not hundreds, of other rioters outside

20   banging to get in to breach those doors as well, so infinitely

21   increasing the mayhem in the Capitol building that day.

22        I'm going to play from Exhibit 6, Mr. Sandlin's footage of

23   the scene at the 1-minute mark to illustrate the chaos and

24   violence that Mr. DeGrave participated in.

25        (Video played.)

1          MS. ARCO:  Stopping at the 2-minute mark.

2      As you just witnessed, Mr. DeGrave participated in that mob

3  push, resulting in those doors being opened.  You can see the

4  stress and panic of Officer B.A., whose victim impact statement

5  you reviewed as a part of Mr. Sandlin's sentencing proceeding.

6  He's covered in sweat, and I can only imagine what was going

7  through his head.

8      You also just witnessed Officer -- oh, I'm forgetting his

9  initials, Your Honor, but it's a part of one of the statements

10  you reviewed as a part of Mr. DeGrave's submissions.  He had

11  just been pepper sprayed by somebody, from one of the rioters on

12  the outside who were pepper spraying in, and it rendered him

13  momentarily blind.  He had to feel along the wall to get to

14  safety, and that was captured as well.

15      Lest we think that Mr. DeGrave just happened to be there,

16  was a passive participant, Exhibit 8 was from Mr. DeGrave's own

17  cell phone.  It shows him recording this assault, and it's

18  short, so I will just play it through from beginning to end.

19      (Video played.)

20          MS. ARCO:  Your Honor, from there, the trio walked up

21  the nearby stairs to the Senate Gallery hallway, which is where

22  Mr. DeGrave and Mr. Sandlin assaulted additional U.S. Capitol

23  Police officers over access to the Senate Chamber.  I know

24  you've reviewed this.  I will skip over this and just summarize.

25      Mr. Colt can be heard in the video directing Mr. Sandlin

1  and Mr. DeGrave we've got to get to, quote, the Senate where

2  they're meeting.  And this is actually Mr. Sandlin's footage.

3  So if we can hear it from Mr. Sandlin's perspective, Mr. Colt is

4  speaking, Mr. DeGrave was right at their side and clearly heard

5  this as well.  And again, it shows that the trio were, you know,

6  bent on disrupting the congressional proceedings itself which

7  they believed were underway.

8       And then I will show now a brief clip from Mr. Colt's

9  GoPro, Exhibit 9, which clearly shows Mr. DeGrave pulling his

10 mask down over his face before he begins participating in the

11 assault on the officers by that door.

12      So I will begin playing Exhibit 9 from the 5:10 mark.

13      (Video played.)

14          MS. ARCO:  You just witnessed him pulling his mask

15 down.

16      Stopping at 5:19 mark and continuing on.

17      (Video played.)

18          MS. ARCO:  Pausing at the 5:37 mark and skipping to

19 the 7-minute mark where you can hear -- you'll hear Mr. DeGrave

20 bragging about his assault on the officers guarding the doors.

21      (Video played.)

22          MS. ARCO:  Stopping at the 7:45 mark.

23      You just heard Mr. DeGrave bragging not just once but twice

24 about assaulting officers and touting the fact that, quote, he

25 didn't see my face, though.

1    Just to be clear, I don't think we can say conclusively

2    that he punched the officers, but certainly, there was a shoving

3    match.  So maybe he embellished a bit on that point.

4        THE COURT:  Ms. Arco, back to the scrum by the east

5    side of the Capitol doors, what is your sense of what

6    Mr. DeGrave did then?  Did he actually touch an officer, or he's

7    just pushing against the mob pushing the officers against the

8    doors?

9        MS. ARCO:  The latter, Your Honor.  I don't think he

10   was close enough to the three officers guarding the door to lay

11   hands on them directly, but our theory is aiding and abetting.

12   He clearly participated in the shoving and the pushing, that

13   obviously it was the force of the whole weight of those 20 or so

14   rioters that were able to assault the officers in such a way

15   that the doors behind them were forced open.

16       THE COURT:  He was fully engaged?  Mr. Colt was up on

17   the stairs?

18       MS. ARCO:  That's correct.

19   Skipping to the 9:45 mark, at which point Mr. Colt has

20   already jumped to the Senate Floor and Mr. DeGrave is egging him

21   on.  Mr. DeGrave has now possession of the GoPro camera that

22   Mr. Colt had previously been recording from, and I'll play this

23   through the end.

24   (Video played.)

25       MS. ARCO:  And you just heard Mr. DeGrave instruct

1    Mr. Colt to open the doors, those side doors of the Senate

2    Chamber Floor to let more of his fellow rioters onto the floor

3    itself.  And you can see Mr. Colt heeding those instructions and

4    opening the door.

5        And turning now to the last exhibit I'll play, from Exhibit

6    12, which is a continuation of the GoPro footage, again being

7    recorded by Mr. DeGrave at this point, and I will play it from

8    the beginning.

9        (Video played.)

10        MS. ARCO:  Stopping at the 15-second mark, you just

11    heard Mr. DeGrave and Mr. Sandlin telling Mr. Colt to keep the

12    door he had just unlatched open.  And as we know from C-SPAN

13    footage of this space, a lot of the rioters who were up on the

14    Senate Gallery start exiting and then later can be seen filing

15    through those doors that Mr. Colt opened.

16        I'm going to skip to the 1:20 mark, and you'll start to see

17    some of those rioters filling in on the Senate Floor.

18        (Video played.)

19        MS. ARCO:  Stopping at the 2-minute mark.

20        As we know from other footage, rioters did begin rifling

21    through senators' paperwork, leaving threatening notes,

22    et cetera.

23        And the last clip I will play, skipping to the 4-minute

24    mark where Mr. DeGrave makes his triumphant exit with Mr. Colt

25    after assaulting numerous officers and achieving his goal.

1        (Video played.)

2            MS. ARCO:  And stopping at the 4:50 mark.

3        Your Honor, there are a few additional points I wanted to

4    address, but I thought perhaps now -- I don't know if you would

5    like to address the accounting issue.  In light of the defense

6    response to your order for an accounting, the government did

7    want to amend its fine request.

8            THE COURT:  To what?

9            MS. ARCO:  To $23,800.

10           THE COURT:  And how are you getting there?

11           MS. ARCO:  So in any event, regardless of -- well, I

12   was expecting to see more detail in terms of what the legal fees

13   entailed.  But in any event, Mr. DeGrave appears to have paid

14   whatever those legal expenses are.  And so the government will

15   not be seeking a fine amounting to his disbursed legal expenses,

16   but we are we are seeking the rest.

17           THE COURT:  23,800?

18           MS. ARCO:  Yes, Your Honor.

19           THE COURT:  Okay.  Here's a question I have, Ms. Arco,

20   and I will ask Mr. Shipley about this.  In these cases where the

21   defendants have been told and defense attorneys but Mr. DeGrave

22   as well were told to return the release forms for financial

23   information and they don't do it, it's completely unverified

24   what his financial expenses are right now.

25       And the way the Court views this is it's his burden to show

he cannot afford to pay a fine.  And the guideline range for a fine is $25,000 to $250,000.  Absent evidence that's substantiated that he cannot afford to pay a fine, again, I think the onus is on him.

I think the Court under the guidelines should impose a fine in these cases.

MS. ARCO:  And I think that's perfectly appropriate, Your Honor, and I'm glad you reminded me of that fact.  I reached out to Mr. Shipley and his associate, Mr. Marshall, when I noticed the absence of the financial verification and statements, because I think it's relevant to Your Honor.  I thought that perhaps more had been done in that regard.  But that's true.

And I will note for the record that in listening to Mr. DeGrave's jail calls while investigating this case, Mr. DeGrave incredibly, to his credit, was working throughout his incarceration.  He had an assistant based in the Philippines who was able incredibly to manage his online business while he was incarcerated.  So presumably, he was still making money, perhaps at a reduced rate than normal, while he is outside.  But he was working during his incarceration.  So presumably, he was making money.  No idea what his accounts stand for.

But just from the government's perspective, our general policy in terms of seeking fines in these matters, we generally haven't been seeking fines unless we see the defendant trying to

1    capitalize off his crimes.

2              THE COURT:  Which he clearly has done here.

3              MS. ARCO:  Oh, 100 percent.

4              THE COURT:  In the amount of $120,000.

5              MS. ARCO:  Incredible.  I haven't seen any other

6    January 6 defendant -- again, I'm not fully -- I don't have full

7    visibility as to all January 6 defendants, but it's more than

8    I've seen.

9              THE COURT:  I'm confused about the government's

10   modification of its recommendation.  How are you getting to

11   $23,800, and why should the Court at a minimum not impose a

12   guideline fine?

13             MS. ARCO:  Understood, Your Honor.

14       So our policy, and I should have stated this more fully, we

15   generally don't seek a fine where the fundraising relates to

16   legitimate legal defense expenses.

17             THE COURT:  But putting that aside --

18             MS. ARCO:  But beyond that --

19             THE COURT:  Putting that aside, in a case where the

20   defendant has not given Probation the ability to verify their

21   funds, their net worth, then why should the Court -- why should

22   the default not be that a fine is imposed?

23             MS. ARCO:  I don't think that's the case.  I think

24   you're right.  I just hadn't thought about it prior to today in

25   those terms.  And so I don't have specific authority to amend

1    our request beyond what I have, but everything you're saying is

2    making sense, Your Honor.

3            THE COURT:  All right.

4            MS. ARCO:  And then just a few more points as to our

5    allocution, Your Honor.  I won't belabor this point, as I

6    believe our submissions, including the one under seal, address

7    it.

8        But despite Mr. DeGrave's public and appreciated

9    cooperation, we have some concerns about the sincerity of his

10   remorse.  To this day, he seems to be minimizing his conduct by

11   excusing it as some kind of performance, and he can't have it

12   both ways, Your Honor.

13       I did want to address this point further in a way that will

14   require me to discuss his debriefs.  Is it possible that we

15   could go under seal?

16           THE COURT:  We can, but before we get there, a thread

17   that came through his papers and, perhaps, Colt as well --

18   obviously, I reviewed them all yesterday.  So they get

19   conflated.  Stop me if I'm mixing them up.

20       But I think Mr. DeGrave did make the point that the need

21   for the protective gear, the need for the bear mace, et cetera,

22   was to fight Antifa.  Am I correct?  Is that him and not Colt or

23   both of them?

24           MS. ARCO:  I think they both alluded to that.

25           THE COURT:  Okay.  So this is the -- this case of all,

1    Sandlin and certainly DeGrave have the clearest evidence of

2    intent to obstruct as any other cases I've handled in terms of

3    out of the defendants' own mouths this is what we intend to do

4    in so many words.

5        How does the Court reconcile that with this Antifa

6    mitigating factor?  I guess the goal could be both, but it

7    certainly does not seem supported by his own words, that the

8    reason he had the gear and the bear spray, et cetera, were to

9    fight Antifa.  It seemed very intent on stopping the count.

10        MS. ARCO:  Agreed, Your Honor.

11        So first, the government does not dispute that the

12    co-conspirators intended to record their actions.  But what is

13    central, obviously, to the charge to which he pled guilty,

14    obstruction of an official proceeding, what he swore under oath

15    in his plea hearing and in the Statement of Offense is that he

16    had a concurrent ideological motive to disrupt the congressional

17    proceedings to stop the steal, which he believed would have

18    certified a fraudulent election.  In other words, it wasn't all

19    for show.  He believed in what he was doing.

20        Sure, the outfit and some of the rhetoric may have been a

21    bit amplified for the camera, like oh, I punched this guy five

22    times in the head.  We didn't see that.  He assaulted the

23    officer but didn't punch him five times.  So sure, some of this

24    is amplified.

25        But he engaged in violent acts towards achieving his

political objective of stopping the steal.  I don't think he can

say that his clearly unlawful trespass as a part of a mob, his

assaults, his calls for the theft of government property were

all for the camera.  Mr. DeGrave is not -- he's not stupid.

That was real.  That wasn't oh, I'm going to make this big show

for the camera in a way that inculpates me.  It was real.  He

was hyped up in the moment, yes, but that was real.

And his statement that I mentioned earlier about members of

Congress not certifying if they know what's good for them was

made to Colt in private.  They didn't even know that that was

being recorded.  That was not for the camera; that was decidedly

not for the camera.

THE COURT:  You mean the statement that you mentioned

that was in the backpack with the black screen?

MS. ARCO:  Exactly.  It shows his true intent.

They're walking away from the Capitol, talking about how great

it was.

THE COURT:  There's no GoPro on them at that point.

MS. ARCO:  No, it's in the backpack.  They had no idea

it was recording, completely in private dialogue.  They're not

going to certify if they know what's good for them because we

just terrified them by storming the Capitol and engaging in all

this chaos and violence.

So I think it's more than clear that his objectives

certainly support the elements of the charge to which he pled

1    guilty.  I don't think he's backing out from that right now, but

2    certainly, it can't -- this Antifa narrative, yes, they talked

3    about Antifa.  Yes, there's some mention in the group chat about

4    oh, you know, self-defense this, but they tempered their bravado

5    a bit, but certainly, there's a lot of other evidence showing

6    that this -- their ideological motive motivated them to storm

7    the Capitol, to disrupt the proceedings, and to engage in all

8    this violence in support of that motive.

9        So I don't think that they can credibly say, and indeed I

10   think it would controvert the plea agreement, to say that

11   Mr. DeGrave's conduct was all for the camera.  I think that's

12   applicable to Mr. Colt as well, which I will address this

13   afternoon, but I just wanted to make that -- you affirmatively

14   asked, but I did plan on making that clear for Your Honor.

15           THE COURT:  Okay.  I appreciate that.  So on the

16   substantial assistance, is that all you have left?  I think I'd

17   prefer to hear from Mr. Shipley and then let you all --

18           MS. ARCO:  There are a few things I would like to say

19   under seal, but I think --

20           THE COURT:  Related to the cooperation?

21           MS. ARCO:  Related to things he said in his debriefs,

22   yes, that I think are important for Your Honor to consider in

23   determining his ultimate sentence.

24       But just two more quick points, and I will close.

25       Turning back to the 3553(a) factor of specific deterrence,

1    Mr. DeGrave's past, as discussed under seal and which I will

2    mention again after Mr. Shipley speaks, in his recent pretrial

3    violations, which are incredible to me given how close we are to

4    sentencing, show that he is still, after 17 months in custody,

5    willing to break the rules and defy authority.

6        So I think, if anything, he's showing us that specific

7    deterrence still is in order.

8        THE COURT:  Honestly, Ms. Arco, I was shocked that the

9    government made the motion to release Mr. DeGrave from prison at

10   the time he entered his plea.  It isn't really clear to me, even

11   after reviewing your cooperation motion, why that was a

12   necessary step or a wise one.

13       MS. ARCO:  I understand, Your Honor, and trust me,

14   that was heavily debated in our office.  I think there were

15   multiple considerations at play.  And in particular, as a

16   cooperator -- certainly, the marshals could have transferred him

17   to another facility, et cetera, but there was the safety element

18   of him remaining as a public cooperator.

19       THE COURT:  But that's true almost every time someone

20   agrees to cooperate.  Anyway, at the time I felt -- had some

21   trepidation, and it's borne out.  We'll get into this more in

22   the sealed proceeding, but that really was not either necessary

23   or a wise decision in retrospect.

24       MS. ARCO:  Understood, Your Honor.

25       So I will step down, but again, we believe that the filings

1    and exhibits amply show why our requested sentence of 37 months,

2    provided that you grant the 5K motion, the $23,800 fine, the

3    agreed to $2,000 in restitution, and three years of supervised

4    release is supported by the 3553(a) factors and is sufficient

5    but not greater than necessary to achieve the goals of

6    sentencing.

7         THE COURT:  Okay.  And back to your recommended fine

8    of $23,800, I take it you looked at the presentence report and

9    at the specific information he provided that's not verified and

10   tried to calculate what you thought was a reasonable fine that

11   he could afford to pay?

12        MS. ARCO:  Your Honor, it was -- to be honest, it was

13   purely based on the accounting, so just what he has fundraised.

14   That was not related to presumably legitimate legal expenses.

15        THE COURT:  Oh, so you subtract like the travel here

16   for sentencing and that kind of thing?  Is that what you mean?

17   I don't think that much was left over.

18        MS. ARCO:  It was just he disbursed legal fees to his

19   counsel, and then we sought everything else that he has fund-

20   raised.  So I specifically do not think that the

21   taxpayer should -- he should be able to expense his court-

22   related travel.  He made a disbursement to his attorney, but he

23   found the funds to get to Washington, D.C., to commit these

24   crimes.  As Judge McFadden has held in other cases, he can find

25   the means to come back here for his sentencing hearing.  So I

1    don't think he should be able to expense even court-related

2    expenses.

3             THE COURT:  Understood.  So that's just the delta

4    between the attorney fees and the 120?

5             MS. ARCO:  Yes, ma'am.

6             THE COURT:  All right.

7             MS. ARCO:  Thank you.

8             THE COURT:  Mr. Shipley, I will hear from you, and

9    then we will go under seal, and I will give Mr. DeGrave

10    afterwards an opportunity to speak.

11             MR. SHIPLEY:  Thank you, Your Honor.

12        About 30 years ago, my mentor, for lack of a better

13    description, was a Superior Court judge in Fresno County, later

14    went on to the Fifth Circuit Court of Appeals in California.  He

15    was retiring, and I asked him, Nick, why are you retiring?  He

16    looked at me and said, Bill, I've spent 25 years listening to

17    the difference between misdemeanor stupidity and felony

18    stupidity, and I'm just tired of it.  He essentially had

19    characterized most criminal activity that he had confronted as

20    both trial judge and appellate judge in two categories, and it

21    was all just stupidity.

22        Now, I don't know that that necessarily is a fair

23    representation of all criminal activity, but I think it's a fair

24    representation of much criminal activity on January 6.  It was

25    just idiotic.  The motivations that brought people there, the

1    decisionmaking they engaged in while they were there, lack of

2    maturity they demonstrated in the decisions and options they

3    chose, and the manner they conducted themselves, you know,

4    essentially videotaping their own crimes.

5              THE COURT:  I agree with you, Mr. Shipley.  A lot of

6    what Mr. DeGrave and his co-defendants did was idiotic.  But on

7    top of that, it was also extremely reckless and life-

8    threatening, particularly to those officers who were jammed up

9    between the east doors of the Capitol and the mob on both sides.

10   That video is terrifying to watch, and that is a lot more than

11   idiotic.  That is putting law enforcement officers' lives at

12   stake who were there to defend the Capitol and those inside.  It

13   minimizes the nature of what happened on that day to describe it

14   all as idiotic.

15             MR. SHIPLEY:  Your Honor, if I was suggesting to the

16   Court something that the Court wasn't already aware of, then

17   that might be true.  But the Court's seen all those videos.

18   I've seen all those videos.

19        I sat through two Oath Keepers trials, which had a lot to

20   do with the Columbus Doors and how those doors were forced open

21   by the crowd on the inside to allow access by the crowd on the

22   outside.  And at one point on the outside, there were only two

23   officers, Officer Mark Carrion and a second officer whose name

24   will come to me.  They were the only two on the outside.

25             THE COURT:  But what's the point about how idiotic it

1    was?  Idiotic decisions bring consequences.

2              MR. SHIPLEY:  No question.

3              THE COURT:  What's the point that you're making

4    about --

5              MR. SHIPLEY:  Well, he's sitting here, you know, now a

6    convicted felon facing sentencing for two serious felony

7    offenses under Title 18.  He admitted to attempting -- not

8    attempting.  He admitted to corruptly obstructing an official

9    proceeding.  I'm not suggesting this is a misdemeanor stupidity.

10   It's clearly a felony stupidity.

11        But I also think and sometimes in my own experiences I

12   think there's a little bit of a lack or a loss of perspective

13   with regard to the thought process of different people who came

14   on January 6.  And I think Judge McFadden crystallized it for me

15   in a verdict, and I captured this in my statement.  A lot of

16   people came just to be part of an event and to watch; others

17   came to be more active and more problematic; and some came just

18   to commit violence and to cause trouble.

19        I don't think Mr. DeGrave and Mr. Sandlin and Mr. Colt came

20   to commit violence and cause trouble, but that's what they

21   decided to do after they were there.  They engaged in a series

22   of idiotic decisionmaking that brought them to the front of the

23   crowd, into the building, and then attempting to gain access for

24   others by pushing doors open.

25             THE COURT:  You don't think all of the statements and

the planning they did in advance showed an intent to be willing
to engage in violence?

MR. SHIPLEY:  I don't think so, because the violence
would have had to be targeted at either Congress or the police
officers.  And that just became the people that were in front of
them, you know, the items they wore.

And I think the government will acknowledge this, because
there was -- Mr. DeGrave tried to explain something during the
cooperation the government didn't initially believe but I think
came around to believe.  At first, they thought that Vice
President Pence had done what they expected, which was to refuse
to allow the votes to be counted, and they were expecting Antifa
or other counter-protestors to react violently to that.  That's
what they expected to happen, was that Vice President Pence
would do what the crowd wanted him to do and that the violence
would be visited upon the crowd by outsiders reacting to that
decision.

Now, that's not what happened.  Vice President Pence issued
the statement shortly before the proceeding and said that he
believed he had no authority to stop the vote count and would
not do so.

Mr. DeGrave thought Vice President Pence had actually done
what the crowd wanted him to do, not the opposite.

THE COURT:  So what was he doing storming the Capitol?

MR. SHIPLEY:  Because other people are going inside.

When they make the point to go inside, people are already inside.

THE COURT:  Well, why are they saying after the fact "we did it, we did it," not Pence did it, "we did it"?

MR. SHIPLEY:  Well, they made history.  You hear him say in the video, "We made history, dude.  You jumped down onto the floor," talking to Colt.

They've captured all of this on video.  They captured their own idiotic thoughts on video starting hours before.  And now they're going to go back and monetize this.

That was the life, as I pointed out in the sentencing memo, that Mr. DeGrave had led for nearly a decade up to this, was to make himself famous.

THE COURT:  But why isn't that -- the monetizing, why isn't that an aggravating factor, to engage in violence, to assault officers, and then try to monetize that?  Why is that a mitigating factor?  Just because it's so stupid or --

MR. SHIPLEY:  Well, yeah, because it's -- because the monetizing factor is driving the decisionmaking, not to go there for the purposes of causing trouble or engaging in violence.  That becomes a byproduct of the decisionmaking at the moment in time where they're at, which is after they gain entrance to the Capitol.

There's no violence getting into the Capitol.  They follow the breach that had taken place by others earlier.  They walked

through open doors after others have breached the Capitol and
hundreds are already inside.  They simply became a part of that.

THE COURT:  All right.  As I said to Ms. Arco, I don't
have any case where the evidence of intent to obstruct is as
clear as it is in this case.

MR. SHIPLEY:  And he pled guilty.

THE COURT:  And his Statement of Offense says he had
the intent.  He's admitted that at the time of his plea.

MR. SHIPLEY:  I don't disagree.  But it was all for
the purpose of creating content.

THE COURT:  Again, that to me is an aggravating
factor.  You're going to interfere with the certification of the
election results, number 1, crime number 1, and then you're
going to monetize that to become wealthy and famous.  That to me
is not a mitigating factor here.

MR. SHIPLEY:  I understand that, but that would apply
to all three of them.  And I think the Court reflected that in
the decisionmaking with regard to Mr. Sandlin, not just that
that was his motivation but also he's clearly introducing and
carrying the thought process for the other two, as reflected in
the videos.  He's talking for eight, nine, ten minutes, and then
he turns the camera to the others for 20 seconds, and then he
turns it back to himself.

That is the exact same dynamic that existed between the
three of them when they were talking.  It was Mr. Sandlin going

on and on and on and on, and the others would simply chime in at times.

So this is like a three-ring circus that the three of them are orchestrating.  And the entry into the Capitol was simply another place to record themselves.  And I don't disagree with the Court that it's idiotic that they would do it for that purpose, but that's the truth.

And in fact, I think the government doubted that.  The government doubted that was the purpose.  The government actually believed the purpose was more political.  And over time and through sessions, I think the government actually came along to think these really were just three clowns doing idiotic things, because they are recording their own crime spree, so to speak, from step to step to step.

It's just -- it's inexplicable otherwise that they would find it so important to not only capture video of themselves but to have a running audio of what they're doing all along.  For what other purpose would somebody be doing that?

And it goes to -- well, if you look at the lives they led in advance of January 6, it makes perfect sense.  The lives they led in advance before January 6 became an opportunity.  It was all about monetizing their presence on social media.

Mr. DeGrave at one point had 100,000 followers on Instagram for his business, which was selling health supplements.  The more attention he could draw to himself -- that's the stories

1   about going to events in Las Vegas and getting himself on video

2   with famous people, was all about attracting followers.  This

3   was just another opportunity.

4           THE COURT:  Again, Mr. Shipley, this whole argument to

5   me is an aggravating factor, not a mitigating.  If his whole

6   motivation was just to make himself more money and that's why he

7   was assaulting the officers rather than an honest belief that

8   the election was stolen and he's been manipulated, to me, the

9   former is more aggravated.  It's just a greedy, you're going to

10  put the lives of law enforcement officers and others at risk in

11  order to make a lot of money.

12          MR. SHIPLEY:  I'm not saying that was the only

13  motivation.  He clearly acknowledges, he was a follower and

14  supporter of former President Trump.  No question about it.

15  They talk about concerns about the election all through their

16  videos and the Facebook postings leading up.  It was the reason

17  they made the trip.

18      But the event at the end of the trip was an event that

19  could be captured.  Going into the Capitol became an opportunity

20  at the moment, not something that was planned in advance.  The

21  trip was planned in advance.  The rally was planned in advance,

22  all of that.  Their presence there was their opportunity.

23  Things unfolded in ways as they developed that day, and they

24  just kept the cameras rolling, and they kept talking, and they

25  kept filming.  I'm just giving the Court what I think is context

1    for their commentary and their conduct.

2            THE COURT:  So they didn't express ahead of time an

3    intent to stop the certification?  I thought they did.

4            MR. SHIPLEY:  No, I think they expected Vice President

5    Pence would stop the certification.

6            THE COURT:  But that they would be involved in some

7    way.

8            MR. SHIPLEY:  Supporting Vice President Pence's

9    decision.  Now -- and we can all sit back in retrospect, in

10   hindsight and say that was nonsense.  But Congress passed the

11   Electoral Vote Act which created the process, likely in

12   violation of the Twelfth Amendment, allowing for the objecting

13   to electoral count votes.

14      The people that sat back and watched that process were

15   entitled to have a political expectation that it would go one

16   way or another, because that process exists, and it's in a

17   statute.  And I don't think the statute is consistent with the

18   Twelfth Amendment, but that's a different question.

19      So the observers had the right to be either -- to either

20   applaud what happened or to condemn or criticize what happened.

21   They didn't have the right to go in the building.  They didn't

22   have the right to try to change Congress's mind by force or

23   violence.  But they certainly had the right to have a rooting

24   interest in the process going one way or going another way,

25   because that process was set forth in the statute.

1    So they can talk about it in advance.  They can express a

2    desire to have one outcome or another in advance.  And none of

3    that should be condemned, because that's all a part of the First

4    Amendment process.

5    So -- but it's clearly when they cross the line, which

6    again Mr. DeGrave didn't realize, and he told the government,

7    the government didn't believe but then later came around to

8    believing, yeah, I think they did.  They thought Vice President

9    Pence had done what they wanted him to do, and in fact, going to

10   the Capitol was more of a celebration until the opportunity to

11   go inside actually developed.  It was like well, let's go

12   inside.

13   Then over time, they realized that Vice President Pence had

14   not done --

15           THE COURT:  How can you reconcile that narrative with

16   the video I remember watching multiple times in the TGI

17   Friday's?  Aren't they saying then we're going to go storm, it's

18   time for blood, people are going to die?

19   This is not spur of the moment, we're standing outside the

20   Capitol and people are rushing in.  This is, let's get out of

21   this restaurant to go to the Capitol so we can be a part of the

22   storming of the Capitol and have blood on our hands like true

23   patriots.

24           MR. SHIPLEY:  But if you watch the video, there's

25   references to and talking about bricks being laid out in various

parts of the city and around the Capitol and the expectation

that the bricks were put in place for Antifa or other counter-

protestors, and that was the expectation of what was going to

happen at the Capitol, was that there would be a clash between

the two sides because bricks were already in place, which is

something that mythologized or factual, whatever it might be, in

the protests of the summer of 2020 and into the fall of 2020,

there were episodes where it was claimed that bricks were

strategically located in cities where riots had taken place.

In fact, you have Mr. DeGrave picking up his phone and

showing the others look, here's the pictures of the bricks.

Now, they're bricks outside a construction yard.  So who's to

say.

But they are talking about that at the TGI Friday's, the

need to go to the Capitol because violence might take place, but

it's not a contemplation of violence against the Congress or

against the police.  It's an expectation that there might be

violent clashes at the Capitol.

And we can't forget, there were violent clashes on November

14th.  There were violent clashes on December 12th.  In both

instances, it was supporters of President Trump clashing with

counter-protestors in the streets.

THE COURT:  But at some point -- even accepting your

theory as true, and I'm not sure the evidence supports it, but

even if I were to accept that, at some point it becomes quite

1    clear the other side are the law enforcement officers in the

2    Capitol building, in and around the Capitol building.

3            MR. SHIPLEY:  And they deserve every fault for their

4    decisionmaking when that became the reality in front of them.

5    And that's why he pled guilty to assault and he pled guilty to

6    obstruction, because once they're at the Capitol building and

7    once they're inside, you're absolutely right, there's no

8    counter-protestors.  That's not who the conflict exists between

9    at that point in time.

10           THE COURT:  And taking the law into your own hands and

11   fighting protestors is not legal either.

12           MR. SHIPLEY:  I'm sorry?

13           THE COURT:  Fighting against Antifa on your own also

14   is not legal.

15           MR. SHIPLEY:  Correct.  But it's a completely

16   different crime than obstructing or interfering with the

17   operations of government.

18       This town is famous for having clashes between protestors

19   at various locations around the city.  The Metropolitan PD may

20   be the best in the world at trying to keep opposing factions

21   apart from each other.  They train on that constantly.  There's

22   been testimony in this courthouse about that.  So that's not --

23   this town is not a stranger to that, never has been.

24           THE COURT:  Either way, there's an intent to violate

25   the law that's planned well in advance.

1          MR. SHIPLEY:  Oh, I don't disagree, there's an intent

2     to come here to be a part of an event that might involve

3     illegality.  They didn't travel across country with motorcycle

4     equipment and bear spray and Mr. Colt and Mr. Sandlin bringing

5     firearms with them -- and the point I raise in the motion was

6     Mr. DeGrave told the government that he didn't realize that they

7     actually had firearms until they got to D.C., and that goes

8     along with the story of him being at the wrong airport after

9     flying overnight and then having to wait.

10          He sleeps in the car the entire way to Washington, D.C.,

11     from Memphis -- or no, from Nashville where they get him.  11 or

12     12 hours to Washington, D.C., he's asleep in the van while

13     they're riding up front.  He doesn't even know there are

14     firearms until after they arrive in Washington, D.C.

15          Yes, they discussed it.  He had a firearm which he owned

16     lawfully and didn't bring with him.  He didn't know the others

17     had actually brought them until he saw them later.

18          So that was -- I wasn't trying to mislead the Court with

19     that statement.  That was his own recollection, which he gave to

20     the government.

21          So I want to talk a little bit about, though, the process

22     for how we got here, because I think it's instructive, and I

23     think the Court should hear it, because it relates to

24     Mr. DeGrave as opposed to Mr. Sandlin as opposed to Mr. Colt.

25          You know, even the government's evidence, in many ways,

it's hard to distinguish between Mr. Colt and Mr. Sandlin -- I'm
sorry, Mr. Colt and Mr. DeGrave.  Based on what the government
submitted, Mr. Colt's doing much more filming of himself and
much more talking himself as to his own conduct and his own
thought processes.

THE COURT:  He's not assaulting officers.

MR. SHIPLEY:  No question about it.  But the only two
things in that respect that Mr. DeGrave did do, as the Court
pointed out, which was push against other protestors pushing
against the officers trying to open the Columbus Doors, which
open out --

THE COURT:  In a super dangerous situation.

MR. SHIPLEY:  No question.  And then the scuffle on
the second floor, which the video shows is far less than the
government had characterized in the bond proceedings.

And I understand the bond proceedings for Mr. DeGrave
didn't take place before Your Honor.  They took place before
Judge Friedman.  But you did Sandlin.  So you saw some of this
video at the time.

But I honestly think that had I come to the Court with a
well laid out, dissected analysis of this evidence, given the
nature of the physical confrontations between Mr. DeGrave and
the officers, he likely would have been released, because he
wasn't brutalizing the officers.  He wasn't using any weapons
against any officers.  He didn't injure any officers.  He

1   certainly didn't make their lives easier, but his conduct, you

2   know, kind of bordered between the assault under 111, the issue

3   that's now arisen in 111 and several cases, this question, it

4   covers such a broad scope of activity, from assault to impede to

5   obstruct to interfere.

6       There can be nonassaultive conduct that violates that

7   statute, and I think pushing against the crowd which is pushing

8   against the officers is closer to obstructing or impeding than

9   it is to actually assaulting the officers, because assault

10  requires an intent to injure.

11      And the event on the second floor is more of a pushing

12  match than any kind of striking, any blows.  So there's no real

13  intent to injure there outside the Senate Gallery Door.

14      So I think a very persuasive case could have been made to

15  release him at that time had I come to this Court and laid it

16  out.  But I was dissuaded from doing that by the government.

17  Because from the moment I came into this case in September of

18  2021, I was discussing with the government an outcome and

19  cooperation from the earliest days, September 2021 until he

20  actually pled guilty in June of 2022, ten months later.

21      And I had prepared a motion, a lengthy motion for release

22  pending trial going through all this analysis, and in

23  discussions with Ms. Arco, talking about cooperation, talking

24  about an outcome, she asked me not to file it because it would

25  make her life more complicated internally trying to work out an

1    outcome in cooperation.  So I didn't.

2         So as a result, Mr. DeGrave sat in jail for 18 months

3    before he was finally released in June of 2022 in connection

4    with his agreement.

5         Contrast that with Mr. Colt, who hasn't spent a day in

6    jail.  He was released in the District of Idaho on his

7    arraignment.

8              THE COURT:  You need to plea and cooperate

9    immediately.

10             MR. SHIPLEY:  That doesn't change the facts of what

11   somebody did.  And I've struggled with that issue with

12   cooperators in this district.  There are Oath Keepers who pled

13   guilty to seditious conspiracy that have been allowed on bond.

14             THE COURT:  Well, when someone accepts responsibility

15   immediately and is remorseful, I think there are times where the

16   government views them differently from somebody who is not able

17   to do that.

18             MR. SHIPLEY:  We were interviewing and proffering and

19   admitting conduct in September of 2021.

20             THE COURT:  All right.  But that's kind of beside the

21   point.  Here we are at sentencing.  He's served 18 months.  So

22   that's 18 months less he will have to serve now.

23             MR. SHIPLEY:  That gets us to where Mr. Colt stands

24   today, which is he's never spent a night in jail, and the

25   government's recommendation for him is going to be 18 months.

1          THE COURT:  And you're not privy to the why on that,

2    just like he's not privy to the why on the 36 months.  These are

3    sealed motions, and you can't compare apples and oranges.

4       So this doesn't really help Mr. DeGrave.  When I contrast

5    the motion filed by the government with Mr. Colt and the motion

6    with Mr. DeGrave, there's a difference that's warranted.

7          MR. SHIPLEY:  I understand.  But there's information

8    that we will get into in the sealed proceeding that the

9    government didn't give you with regard to --

10          THE COURT:  Okay.  And I'm happy to hear that.  Let's

11   stick to Mr. DeGrave rather than a comparison to Mr. Colt,

12   because you don't really know what Mr. Colt did or didn't do.

13          MR. SHIPLEY:  Okay.  Let's talk about Mr. Sandlin,

14   then, because that's not subject to a cooperation agreement.  He

15   got 63 months.  He engaged in physical conduct, physical

16   hand-to-hand assaultive conduct on an officer.  He's clearly

17   the -- I don't want to use the word "ring leader."  I already

18   used that.  But he clearly orchestrated this.  He's the center

19   of gravity between the three of them.

20          THE COURT:  And that's why the government's

21   recommendation is substantially lower for Mr. DeGrave.

22          MR. SHIPLEY:  Right.  But when we get to the plea

23   agreement for Mr. DeGrave, in effect, the government -- and I

24   knew this was coming, and I told Mr. DeGrave this was coming.

25   What was coming was going to be a plea agreement that was take

1  it or leave it, and we had to eat the enhancements because we

2  didn't have a choice.  We were already ten months into the

3  process.

4          THE COURT:  So you're saying he admitted things that

5  he didn't actually do?

6          MR. SHIPLEY:  No.  I'm saying that the government gave

7  us no choice but to eat enhancements in order to essentially

8  take away the benefit of the cooperation.  Because now we're

9  here with a recommendation --

10          THE COURT:  What enhancements do you think don't apply

11  to his conduct?

12          MR. SHIPLEY:  I think the planning was highly

13  questionable.  I mean, everybody who came to D.C. from somewhere

14  else planned to get here.

15          THE COURT:  No, you would have lost that.  Rest

16  assured.  So don't worry that that you had to eat.  I don't see

17  how bringing bear spray and everything else would mean that I

18  would not apply it.

19          MR. SHIPLEY:  Now, I will acknowledge you're the

20  authority far beyond me, but I --

21          THE COURT:  Even the silly Halloween outfit, when he

22  pulls his mask down to assault the officer?

23          MR. SHIPLEY:  Well, if you look at the videos, there's

24  other videos, you can see he's pulling the mask up because the

25  eyes are fogged.  It's a cold day.  He's sweating.  He can't

1    see.  He has to take the mask up to see, and then he pulls it

2    down when he thinks he might get hit.

3         He's not trying to hide.  It's going up and down, up and

4    down because he can't see.  It's that kind of mask with plastic

5    goggles.

6              THE COURT:  And he also doesn't want to get hit in a

7    skirmish with the police or scene or whatever it is.  He

8    intentionally pulls it down.

9         Anyway, I don't think you would have won on the planning.

10   What other enhancement?

11             MR. SHIPLEY:  Well, but on the planning, it strikes me

12   when you read the guidelines, the planning has to be planning in

13   connection with the offense conduct.

14             THE COURT:  But, Mr. Shipley, you've agreed to this.

15   You haven't objected to it.

16             MR. SHIPLEY:  Fair enough.  We're not supposed to be

17   arguing.  I understand.

18        But the point is that we get to 37 months as the

19   recommendation only because the government had ratcheted up the

20   guidelines in a way --

21             THE COURT:  I don't think they've ratcheted it up.

22             MR. SHIPLEY:  I'm sorry?

23             THE COURT:  I don't think they've ratcheted it up.

24             MR. SHIPLEY:  63 to 78 months.

25             THE COURT:  The guidelines.

1          Yes, Ms. Arco.

2          MS. ARCO:  Your Honor, I just want to note for the

3     record that we're in pseudo breach territory.  So I mean, you

4     agreed to this, and I think this is concerning.

5          THE COURT:  This is not a helpful argument to the

6     Court.  If what you're saying is he needs to withdraw his plea,

7     then we can litigate that, but I don't think it's helpful to

8     Mr. DeGrave to focus on enhancements that he's agreed to.  He

9     could have gone to trial.

10          MR. SHIPLEY:  I understand.  And what I'm talking

11     about -- the Court's not involved in the plea process,

12     obviously.  The Court doesn't involve itself and doesn't

13     necessarily need to know the mechanics of the back and forth.

14          But this came at the very end of a long period of

15     discussions, and it was placed to us in a take it or leave it

16     fashion, and we took it in good faith that when we got to the

17     cooperation provision it would be accounted for.

18          THE COURT:  Okay.  And we will go under seal and talk

19     about whether you think the cooperation wasn't substantial

20     enough.

21          MR. SHIPLEY:  And then when we get there, one of the

22     other issues that arose and the Court has already suggested that

23     it might have had a different view at the time, but the

24     imposition of the home incarceration provision after being

25     released, locking him down so to speak, again, that was an

1    insistence by the government to even consider.

2          THE COURT:  And I would have insisted on it myself,

3    Mr. Shipley.  After a plea, releasing someone from prison after

4    they've admitted guilt, it's generally not what happens,

5    particularly when you're looking at a guideline range of 63 to

6    78 months.  That was an extraordinary motion the government

7    filed on Mr. DeGrave's behalf.

8       I had, as I said, real reservations about granting that,

9    and I regret it now.

10         MR. SHIPLEY:  Ms. Arco mentioned that, and the Court

11   had a reaction.  Frankly, I only know of one thing.  I'm not

12   sure if there's something beyond simply the -- the terms he's

13   on --

14         THE COURT:  I think it's a pretty egregious violation

15   in the last ten days or two weeks, whatever it is.  I think it's

16   pretty egregious to suggest that there's a problem with a

17   battery and okay, I'm going to go outside and walk around the

18   house and then disappear and go swim in the pool with your

19   girlfriend.

20      That's very sneaky and inappropriate when you're on home

21   confinement a week away from sentencing.  It's shocking.

22         MR. SHIPLEY:  He's here right now, and the battery has

23   once again died.  He's been in contact with Pretrial Services

24   yesterday and today.

25         THE COURT:  So every time the battery dies, you're

1    allowed to go swimming when you're on home confinement?

2        MR. SHIPLEY:  Well, he's in an apartment complex, and

3    he's on the second floor, and he actually has said, I actually

4    had more outside time in DOC than I have in a second floor

5    apartment.  So he can go to the mailbox, and he can go to the

6    garbage, and that's about it.

7        THE COURT:  Mr. Shipley, this applies to anyone who is

8    on home confinement.  He's not unique.  You can be locked up in

9    a cell, or you can be locked up in your home.  Generally, people

10   prefer to be locked up in their home.

11       MR. SHIPLEY:  And I have discussed with the government

12   coming back and seeking to modified that, and they have

13   explanations which we will cover later for why we didn't do

14   that.

15       THE COURT:  Okay.  Is there anything else you can say

16   on the public record before we go under seal to talk about the

17   cooperation, which seems to be the root of your frustration with

18   the government's recommendation?

19       MR. SHIPLEY:  Yes, I'm frustrated.  I'm frustrated by

20   the path that brought us here today and looking at the numbers

21   we're looking at.

22       THE COURT:  What about the financial?  That can be on

23   the record.  Why has he not returned the consent form so that

24   Probation can do its job and verify his finances?

25       MR. SHIPLEY:  I asked him that, and he said he signed

1    every form he got.  I can't account for which forms he got.

2    Until we got here today --

3              THE COURT:  He got the forms, and he was reminded

4    about the forms when he was on the interview with you.  So

5    there's no excuse for oh, I forgot.  And Probation pointed out

6    in the PSR that they didn't have the form.

7        So you all were on notice well before this sentencing

8    hearing that he has not complied with the rules.

9              MR. SHIPLEY:  There's only one form that was at issue,

10   and that was just the consent form for credit report.

11             THE COURT:  Well, we don't have it.

12             MR. SHIPLEY:  But he has bank accounts.  The bank

13   account's been monitored by Probation and Pretrial Services.

14   He's been engaged in business online from his apartment.  His

15   finances are transparent.

16             THE COURT:  I will let Ms. Gavito address what she

17   could not access because he had not returned the form or forms.

18   I don't know if it's one or more.  But my understanding is it's

19   much broader than just the credit report, but I will hear from

20   Ms. Gavito in a moment.

21             MR. SHIPLEY:  Well, on that -- and I will -- if there

22   is credit information that he hasn't provided, then I would ask

23   the Court to continue the conclusion of this sentencing hearing.

24   I'll be back here in three weeks, and I will bring him back

25   again, and he will have that information, because he is not --

1          THE COURT:  I'm not going to give you three weeks to

2     do this.  This was due months ago.

3          MR. SHIPLEY:  Again, Your Honor, I apologize.

4          THE COURT:  Why can't you do it immediately?

5          MR. SHIPLEY:  I have had conversations with the

6     government about his finances for weeks, because he's been

7     operating businesses, which the government has been aware of all

8     along.  I never saw a red flag go up that the government was

9     concerned.

10          THE COURT:  He's about to file taxes.  All of this

11     should be readily accessible.  Why do you need three weeks to

12     come back with the financial form?

13          MR. SHIPLEY:  Well, I only mentioned that because I

14     will be back in three weeks and we can finish this hearing at

15     that point.

16     I can submit the paperwork within three days if the Court

17     wants to just hold its judgment.

18          THE COURT:  I will consider it, but it will be by --

19     today is Tuesday.  Yeah, I don't know.  Let me hear from

20     Probation exactly what's missing.

21     I don't understand, Mr. Shipley.  This is -- I don't know

22     if you're in other districts that have other practices.  I think

23     this is pretty uniform for Probation across the country.  But

24     you waive things by not complying with the rules.  And if you

25     don't want your clients to be fined, you need to make sure they

1    get the financial release forms in so the information can be

2    verified.

3          MR. SHIPLEY:  And the forms came to me, and I

4    forwarded them to Mr. DeGrave.

5          THE COURT:  Then it's on him.  Even worse.

6          MR. SHIPLEY:  I understand; I understand.  But we're

7    not trying to hide it.  He's been transparent with Pretrial

8    Services.  They monitor his business income.

9          THE COURT:  Well, what do you say in response to the

10   government's point that he shouldn't get, you know, travel to

11   the sentencing hearing off of the funds he raised?  That's not

12   appropriate.

13         MR. SHIPLEY:  The Court ordered me to give an

14   accounting of the fundraising, and I provided the accounting.

15         THE COURT:  But you're suggesting in your accounting

16   that there's no money left to be fined.  And that's just -- it

17   depends how you look at what's legitimate.

18         MR. SHIPLEY:  Fair enough, and I'm not -- I didn't

19   take the position that one was legitimate or another.  I

20   identified where the money had been spent.

21         THE COURT:  All right.  Is there anything else you

22   want to say on the fines before we move -- or anything else

23   before we move to cooperation?  I want to hear briefly from

24   Probation.

25         MR. SHIPLEY:  No, that's fine.  But I just want it to

be clear, Mr. DeGrave is set to go back tomorrow.  We will have
that information by Monday at the latest.

THE COURT:  I might give you until Friday, but let me
hear from Ms. Gavito.

Ms. Gavito, what were you unable to do because Mr. DeGrave
did not return the form or forms that he was required to and was
asked multiple times, I understand, to provide?  Is that
correct?

PROBATION OFFICER:  Yes, Your Honor.

So after the defendant pled guilty, the case is assigned to
us by our supervisor, which was October 3rd, 2022.  At that
point, our supervisor sends out an e-mail to the attorneys
explaining that the officer has been assigned, that we need
consent forms.  They explain briefly about the interview process
and how that's going to take place.

That same e-mail contains consent forms, the Probation 1
form, which is the interview form the defendant is questioned
about, and the supervisor requests that all of those forms be
turned in as soon as possible, preferably within 14 days, so
that we can establish the interview and proceed with the
investigation process, which at times takes approximately 30
days to get some of those forms back from schools, from
financial institutions, any other kind of place where we
would -- health-related events where we would get the
defendant's consent, and we would get those forms.  We send them

out, and we give the institutions time to get those documents
and financial statements or health reports back to us.

At the time that the interview was done, which was
January 30th, 2023, I explained to Mr. DeGrave and the attorney,
Mr. Marshall, who was the attorney who participated in the
interview, I said I'm going to need documents regarding
financial statements.

Mr. DeGrave explained that he had two bank accounts, that
he did not have the information right at hand.  But these forms
were sent to him along with the Form 1, and we requested the
information at that time as well.

When the initial draft report is released to the parties,
we make it a point to state that due to lack of release forms
the following information remains unverified, and that usually
will trigger either a defense attorney or the defendant to say
okay, yes, that was an oversight, I should have sent those, we
have not received them or we have not turned them in.

And we usually get them in some cases, but we did not get
them in this case.  So we were unable to run a credit report.
We were unable to verify bank information.  We were unable to
verify any gifts that the defendant may have received.  We were
unable to request income tax documents.  Let's see.  Any credit
cards which would have come up in the credit record, et cetera,
monthly bill statements for any payments that the defendant
makes such as rent, utilities.

1          THE COURT:  So basically, the whole financial

2     information that's in the PSR is unverified?

3          PROBATION OFFICER:  That's correct, Your Honor.

4          THE COURT:  And you could have, had you been given the

5     proper consent forms?

6          PROBATION OFFICER:  That is correct, Your Honor.  We

7     could have at least corroborated some of the information.

8          THE COURT:  Okay.  All right.  And the guideline range

9     is $25,000 to $250,000; correct?

10         PROBATION OFFICER:  That is correct, Your Honor.

11         THE COURT:  Okay.  Thank you, Officer Gavito.

12         PROBATION OFFICER:  Thank you.

13         THE COURT:  All right.  Now we're briefly going to

14    close the courtroom so that the Court can hear information about

15    the defendant's cooperation, which has been filed under seal,

16    and we will, I suspect, reopen the courtroom in about 15

17    minutes.

18         (The following occurred under seal.)

19    ████████████████████████████████████████████

20    ████████████████████████████████████████████

21    ██████████████████████████████████████████████

22    ████████████████████████████████████████████

23    ████████████████████████████████████████████

24    ██████████████████████████████████

25    ████████████████████████████████████████████

54



























Case 1:21-cr-00088-DLF   Document 123   Filed 10/20/23   Page 67 of 93

67













10    (End of sealed proceedings.)

11    THE COURT:  All right.  So, Mr. Shipley, is there

12    anything else you would like to state on the public record

13    relating to Mr. DeGrave's history, personal characteristics, or

14    anything more?

15    I've read, obviously, your sentencing memo, but if there's

16    anything more you would like to say.

17    MR. SHIPLEY:  Your Honor, I think the Court brings

18    this, and I appreciate the Court noting it, that the point I was

19    making when we were talking about this profit motive and fame

20    and fortune motive was the way it ties into his history and the

21    very difficult, fractured upbringing and how he developed his

22    own sense of identity and self-worth from that and launched

23    himself into this, you know, if I can become famous, then I'm

24    successful, and that was the way he defined success for him.

25    And so he looked for these opportunities, but long before

1    January 6, he's doing these things in Las Vegas to sort of draw

2    attention to himself and develop a self-worth from it.

3         And so yeah, the profit motive is crass, and it's, as the

4    Court indicates, not necessarily mitigating.  It's ugly in this

5    instance.  But if we see where it came from and how it

6    developed, it takes on a different context.

7              THE COURT:  And would you put in that same category

8    his fundraising as a, quote, political prisoner?  Is that --

9              MR. SHIPLEY:  He and I -- I will say, I was

10   representing him when he wrote that letter.  I did not know

11   about it.  When I got it afterwards, I said you cannot take the

12   position we've taken with the government, which is yes, I did

13   it, and then at the same time advocate on behalf of I'm a

14   political prisoner kind of -- which was rampant within DOC at

15   that time.

16        And from that point forward, I don't think -- and Ms. Arco

17   and I talked about it.  I think from that point forward, he

18   understood that.  There's an intellectual dishonesty there, and

19   he didn't continue that.  He understood you can't say one thing

20   while in public, for public consumption, while at the same time

21   saying something different to the government in an effort to try

22   to help yourself.

23             THE COURT:  What about his recent getting out from

24   under the electronic bracelet and going for a swim?

25        You say it's a small thing, but it's clearly in violation

1    of his conditions, and he knew that.

2        MR. SHIPLEY:  All I can say is what his explanation

3    was to me, and he told me immediately after it happened.  I

4    didn't have all the details, and I asked him for more of the

5    details.  He said, The bracelet had died, I had recharged it,

6    but it had to recalibrate, they had told him.  It has to kind of

7    give off a series of signals where it's at in order to establish

8    its GPS location.  So they told him go walk around for 30

9    minutes so we can begin to track where it's at.

10        And while walking around for 30 minutes, the last thing he

11    did was jump into the pool, he says 30 seconds or a minute,

12    jumped out of the pool, went back to the apartment, just the

13    last thing he did walking around during the time that he was

14    told he could go out and do this to calibrate the GPS location.

15        He had never been in the pool before.  He's been staring at

16    that pool for --

17        THE COURT:  30 seconds in the pool?  Really?  And then

18    posts it all over his Instagram?

19        MR. SHIPLEY:  I don't believe so.  He's not supposed

20    to be on Instagram.

21        THE COURT:  How did Probation get the photographs?

22    The government got it?

23        MS. ARCO:  No.  My guess is -- they appear to have

24    come from his phone, and they're remotely monitoring his phone.

25    So I think those were taken off his phone.

1          MR. SHIPLEY:  He has an Instagram account for business

2     promotion purposes.  That was a part of his conditions, because

3     that's the way he develops the following for the online

4     supplements he sells.  So for that purpose, he has that

5     Instagram account.

6          I haven't seen the photographs.  I don't know why he posted

7     them.  I don't know what the caption was.

8          THE COURT:  You didn't see them in the government's

9     exhibits?

10          MR. SHIPLEY:  Frankly, I wasn't looking for that.  I

11     had heard the story from him, but that's all I had heard.

12          THE COURT:  All right.  Okay.  Would Mr. DeGrave like

13     to address the Court?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  All right.

16          THE DEFENDANT:  Your Honor, I just want to start by

17     apologizing for what I did.  To see the videos and see the

18     photos and hear myself on the computers, I'm sickened by what I

19     did.  I'm so ashamed.

20          And I want you to know that it's not representative of who

21     I am.  I've always been a proponent of nonviolence and following

22     the law.  And I know that those actions that day are a

23     contradiction to what I've always stood for, and that's part of

24     the reason I'm so devastated by what I did.

25          It's following me everywhere, to be played in public for

1    people to see and to judge me on.  I take responsibility, and I

2    deserve that.  I deserve to be judged on it.

3         But I hope that the Court can see the larger perspective of

4    who I am and that it was the biggest mistake I've ever made.

5    It's terrible.

6         And since I've been released, I know that maybe there's

7    been some regret for doing that, but I've tried so hard to

8    recoup and recover everything that I've lost, and I've spent so

9    much time reflecting and engaging in introspection as to why I

10   did what I did.  If I don't learn the motives behind my

11   behavior, I'm never going to learn, and I'm never going to grow

12   as a person.

13        I feel like I'm a changed person.  I know that I'll never

14   ever do anything like that again.  I'm truly sorry.  I wish that

15   anybody's lives I put at risk, anybody who felt threatened by

16   me, I wish I could apologize to them.  I wish I could look them

17   in the eye and say that I'm sorry.

18             THE COURT:  Mr. DeGrave, you've heard us talk a little

19   bit about your -- whether you're fully remorseful, what you did

20   last week with regard to your electronic bracelet and going

21   swimming in the pool, the fact that some of your prior

22   employment is absent from the PSR.  You didn't return the

23   financial forms.  All of these things make the Court wonder

24   whether you've truly accepted responsibility, are remorseful for

25   what you did, and are prepared to live a different way moving

1    forward.

2         THE DEFENDANT:  I'm super remorseful, and I would

3    never ever not follow a rule on purpose or do anything to

4    jeopardize myself or what I've built.

5         THE COURT:  What made you think it was okay to go

6    swimming?

7         THE DEFENDANT:  I was allowed out at the time.  And I

8    know that I wasn't allowed to go swimming, but I was allowed to

9    leave.  I jumped in to cool off, and I went back in.  And I

10   wasn't swimming.  It was hot.  And it's not an excuse.  I should

11   never have jumped in the pool while I was out.  It was such an

12   idiotic thing to do.

13        THE COURT:  What about not disclosing all your prior

14   employment and giving the financial information that the Court's

15   entitled to?

16        THE DEFENDANT:  Yeah, I was never reminded, I was

17   never told that there was something that was missing, that I

18   needed to fill out any form, and if I was, I would have

19   immediately done it.

20        THE COURT:  Well, Probation has told us here that you

21   were reminded on the call with Mr. Shipley, and then you also

22   told me that you read the PSR, and the PSR says that you haven't

23   provided it.  So I have a hard time understanding that

24   statement.

25        THE DEFENDANT:  I mean, maybe the communication wasn't

1    clear, because again, I would never ever just fail to do

2    something to jeopardize myself or to upset the Court for any

3    reason.

4        All he would have to do is just send me the form now.

5            THE COURT:  Well, we're at sentencing.

6            THE DEFENDANT:  I understand, Your Honor.

7            THE COURT:  And the time it would take to turn around

8    the records now is too long.

9            THE DEFENDANT:  I understand.  I just want you to know

10    that it was not intentional, and I would never intentionally

11    disobey the Court or any of the regulations.  It was an honest

12    oversight, and I never tried to avoid filling out any paperwork

13    that I needed to fill out.

14            THE COURT:  Mr. DeGrave, you've had a lot of trauma in

15    your life.

16            THE DEFENDANT:  I've had a very --

17            THE COURT:  And you've had a mental health assessment,

18    and you don't seem receptive to treatment.

19      You don't think that that could be something that would be

20    beneficial to you?

21            THE DEFENDANT:  I would do anything that provided

22    reassurance of my changed character.  And if it involved

23    therapy, I would be more than happy to undergo therapy.

24            THE COURT:  But do you really want to do it?  Because

25    there are limited resources, and if you don't think that you

1    have a need to --

2        THE DEFENDANT:  I would pay for therapy.  I don't know

3    if a need, but I'm always open to improving myself and becoming

4    a better person, and if that's what it took, I would be more

5    than happy to do that.

6        THE COURT:  I'm not suggesting that by doing that you

7    won't serve the time that I intend to impose.

8        THE DEFENDANT:  Of course.  I understand.

9        THE COURT:  I want to know, for your own benefit, I

10   think we all would like to see you in a healthier place than

11   you've been.  And you had a really rough childhood.

12       THE DEFENDANT:  I've worked my entire life to try to

13   change the legacy of my family tree, and I feel like I've let

14   everybody down over this, these terrible, terrible mistakes.

15     I want nothing more than to try to prove to everybody and

16   to the country and to you that I can change and that redemption

17   is possible.

18       THE COURT:  All right.  Mr. Shipley, what's your

19   position on a mental health condition?

20     It's not that I think he has a severe mental health issue.

21   It's just there is a lot of trauma, and you've made a big point

22   about how this is impacting his decisions.  And it seems to ring

23   true, based on what he said.

24       MR. SHIPLEY:  Having been at this for three-plus

25   decades, I think something that you run across often and I think

this Court has experienced is that sometimes individuals like Mr. DeGrave lack insight, doesn't think he needs help but doesn't realize how that kind of assistance might provide him help that he doesn't at this point in his life recognize he needs.

So the first step is for him to have some insight into how his personal history brought him to a series of decisions over many years in his adult life that ultimately landed him in Washington, D.C., on January 6, you know, impulsive decisionmaking, misplaced priorities, a lack of self-worth, defining one's success in counterproductive ways.

All of those things he lacks.  And I think having some insight into what he lacks probably would do him great benefit.

THE COURT:  I tend to agree, if he's willing to do it. I don't want to impose a condition that he's going to be violating, because I will retain jurisdiction, and I don't want to be dealing with that violation if he's not committed.

THE DEFENDANT:  Your Honor, although I was influenced by the people I was with, I take full responsibility for my actions, because no one told me how to act that day, and I realize that my entire life I have been influenced by people that I've respected and people that I looked up to, whether that was a former president or members of my peer group.

And I do think that there could be some issues that could be potentially resolved, which is my need for attention, my need

1    for validation, my need to impress the people that I'm with.

2    That is a problem.  Although I feel like I have worked on that,

3    I would always love the help of a professional.

4              THE COURT:  All right.  Okay.  Anything else,

5    Mr. DeGrave, you would like to say?

6              THE DEFENDANT:  Just again that I'm really sorry, and

7    I'll accept whatever punishment you deem fit, and whether that's

8    jail time or further home incarceration -- I don't know if you

9    read my letter, but I have so many -- I've hired people that

10   rely on me for their survival.  I've taken on clients.  I've

11   done so much to rebuild my life and to try to move on from this,

12   and to lose it all a second time would just be so devastating.

13             But I --

14             THE COURT:  And I neglected to mention that.  I did

15   read your letter.  Thank you for your letter.

16             THE DEFENDANT:  Of course, Your Honor.  I really meant

17   every word.

18             THE COURT:  All right.  Okay.  Anything else,

19   Mr. Shipley?

20             MR. SHIPLEY:  Nothing.

21             THE COURT:  All right.  Anything from the government?

22             MS. ARCO:  No, Your Honor.

23             THE COURT:  Is there any reason why sentence cannot be

24   imposed now?

25             MR. SHIPLEY:  Nothing for the government -- nothing

1    from the defense, Your Honor.

2             MS. ARCO:  No, Your Honor.

3             THE COURT:  All right.  We've gone on for a long time,

4    and I do have another sentencing.  I'm going to try to keep this

5    brief.

6        We've discussed a lot of the key factors that you can tell

7    the Court has focused on in determining the appropriate sentence

8    to apply here.  That, of course, starts with the guidelines,

9    which we've discussed.  The parties agree that the guideline

10   range here is 63 to 78 months.

11       In addition, the Court is required to consider the factors

12   under 3553(a), and I have done so.  I'm going to focus on the

13   most critical ones, obviously the most important being in this

14   case the nature of the offense, which we've discussed at length.

15       I've adopted the Probation Office's presentence report as

16   my findings of facts.  So to the extent that this is a cursory

17   summary, I have adopted those facts in the report, and they do

18   inform my decision.

19       In short, Mr. DeGrave, along with Mr. Sandlin and Mr. Colt,

20   engaged in extensive planning before January 6 to come to D.C.

21   They talked about -- they exchanged messages.  They did many

22   things that leads the Court to conclude that they did come to

23   D.C. prepared to engage in violence, if necessary, prepared to

24   storm the Capitol, if necessary, and that they were intent on

25   stopping the certification.

The statement that the government highlighted in its allocution highlighted the intent most clearly, and that was a statement that Mr. DeGrave didn't know was being taped at the time.  I think he did view himself as a true patriot, and he viewed it appropriate to engage in violence to achieve his goal. He was clothed in protective gear, clothing, a mask.  Granted, they were not genuine military-type gear, but nonetheless, he managed to use the mask to protect himself, either his identity or his physical being, when he was engaged in a toe to toe with the assaults outside the Senate Door.  He also had bear mace in his pocket.

Now, the defense has made the point that much of this was for the cameras.  They were filming.  They were going to monetize this event.  And that was Mr. Sandlin's idea, I think all agree, but Mr. DeGrave was very much on board with that, that notion.

And so while it is certainly true that some of this may have been exaggerated for the cameras, for example the allegation that he assaulted five officers outside the Senate Gallery or hit them five times, I can't remember the exact statement, those are certainly exaggerations.

There's also a theory, a narrative that he was armed with bear mace and dressed the way he was in order to confront Antifa.

As I've explained, the fact that he had multiple motives is

really not a mitigating factor for me in this case, especially
given the actions Mr. DeGrave took once inside the Capitol.  And
there was sufficient planning in advance of this at TGI Friday's
and even before that I don't put him in the category of
offenders who are just caught up in the excitement of the day
and rushed in and did all these things impulsively.  I think
there was a lot of thought that went into it, and I think that
he and the other defendants were executing on what they had
planned once inside the Capitol.

        The most troubling scene for the Court is the one that was
outside -- or inside the East Wing Door where Mr. DeGrave did
not himself assault any officer, but nonetheless, he was very
much an active part of the mob, the violent mob that was pushing
against officers who were pinned up against the door as the mob
on the other side sought to enter.  That, as I said already in
this hearing, was a terrifying moment.  You can see it on the
officers' faces.  They were sweating profusely, and one of the
officers was sprayed with pepper spray in the eyes as soon as
the doors opened.  That was a terrifying scene that Mr. DeGrave
was fully engaged in.  I just can't imagine the fear that those
officers must have felt as they faced those rioters on both
sides.

        In the upstairs Senate hallway outside the Senate Chamber,
Mr. DeGrave was with Mr. Sandlin as he assaulted the other
officers.  He also brushed against an officer, assaulted an

1    officer, and then bragged about it inside the Senate Chamber.

2        Once inside, he encouraged Mr. Colt to sit in what he

3    thought was Speaker Pelosi's seat, and he directed him to open

4    the door to let other rioters inside the Senate Chamber.  He

5    also directed Colt to take laptops and other items from the

6    Senate Floor.

7        And after the fact, he worked actively to destroy evidence,

8    online posts.  He used encryption, encouraged others to use

9    encryption to conceal the messages that they were sending back

10   and forth as the FBI was beginning to look for individuals.  And

11   once he was interviewed by the FBI and gave a Mirandized

12   statement, he lied to the FBI.

13       Now, on the other side of the equation are many facts and

14   circumstances relating to Mr. DeGrave's background that are

15   truly tragic and heartbreaking.  These are outlined in detail in

16   the defense's memo and also in the presentence report.

17       Mr. DeGrave was raised by an unstable father who was an

18   alcoholic, who had severe mental health issues that ultimately

19   claimed his life, and Mr. DeGrave was -- had to step up and take

20   care of himself, and he was certainly traumatized by a number of

21   events that occurred as a result of his father's struggle and

22   his parents' separation.

23       I do credit what Mr. Shipley says with regard to how this

24   has impacted Mr. DeGrave's poor choices as an adult, and I am

25   taking that into account.

1          I'm also taking into account the cooperation that he gave

2     to the government, and I am granting the government's motion for

3     a departure under 5K1.1.  I do believe that he gave substantial

4     assistance to the government that was helpful in prosecuting

5     others, and he also attempted to provide additional cooperation

6     that ultimately proved not to be substantial.  But nonetheless,

7     his effort and his desire to be cooperative I don't question at

8     all and think he does deserve a departure.

9          Generally, in these cases, I do defer to the extent of the

10    departure, and I've looked carefully at the departure that the

11    government has recommended in this case relative to the Colt

12    case, the co-defendant in this case, and the Court does believe

13    that the distinction in the departure levels is appropriate in

14    light of the timing of Mr. Colt's cooperation, and the nature of

15    his cooperation does, in the Court's view, justify distinction

16    between the two.

17         I'm also looking at whether a fine is appropriate in this

18    case.  We've discussed that at length.  Based on the financial

19    accounting the defense has provided, I do agree with the

20    government that a fine is appropriate in this case, and the

21    guideline range in this case is $25,000 to $250,000.

22         It's possible, if the Court were privy to the financial

23    information that it should be at this stage, that the Court

24    would apply -- impose a higher fine.  It's hard to say, given

25    that Probation was not able to verify the numbers that

1    Mr. DeGrave gave them.

2        But I do think, considering all the factors under 3553(a),

3    I do believe that a guideline fine is appropriate, and I will

4    impose a $25,000 fine in this case, principally for the reasons

5    the government states on the record, but also, I do believe

6    based on the PSR that there are additional funds that

7    Mr. DeGrave could use to pay both the restitution and a fine in

8    this case.  So the Court will impose a fine as well as

9    restitution.

10        Until recently -- I think the Court today senses real

11    remorse from Mr. DeGrave.  It has been slow in coming.  He has

12    given contradictory messages to the Court along the way, even

13    after his cooperation.  But there's no question he accepted

14    responsibility, and he's entitled to a full three-level

15    reduction for his acceptance.

16        Looking at other similarly situated defendants, namely

17    Mr. Sandlin and Mr. Colt, who I will be sentencing later today,

18    Mr. Sandlin received a sentence of 63 months.  He did not have a

19    5K departure.  But considering those sentences that have been

20    imposed, as well as sentences that have been imposed in similar

21    January 6 cases, the Court does believe that the government's

22    recommendation is a fair one, and the Court will adopt it and

23    impose a 37-month sentence in this case.

24        So I will now give the formal sentence of the Court, and I

25    will give each party a chance to object before I actually impose

1 the sentence.

2     Pursuant to the Sentencing Reform Act of 1984 and in

3 consideration of the provisions of Title 18 United States Code

4 Section 3553, as well as the advisory sentencing guidelines, it

5 is the judgment of the court that you, Nathaniel DeGrave, are

6 hereby committed to the custody of the Bureau of Prisons for a

7 term of 37 months as to Counts 1 and 3, to be served

8 concurrently.

9     You are further sentenced to serve a 36-month term of

10 supervised release as to Counts 1 and 3 to run concurrently.

11     In addition, you are ordered to pay a total assessment of

12 $100, which is a total of $200, for Counts 1 and 3.

13     While on supervision, you shall abide by the following

14 mandatory conditions as well as the discretionary conditions

15 recommended by the Probation Office in Part D of the sentencing

16 options of the presentence report.

17     Mr. Shipley, have you reviewed those with Mr. DeGrave?  Do

18 I need to state them on the record here?  They are in the

19 presentence report.

20         MR. SHIPLEY:  I've covered them.

21         THE COURT:  You've covered them?

22         MR. SHIPLEY:  Yes.

23         THE COURT:  Okay.  The mandatory conditions include

24 not committing another federal, state, or local crime, not

25 unlawfully possessing a controlled substance, refraining from

1    any unlawful use of a controlled substance, submitting to one

2    drug test within 15 days of placement on supervision and at

3    least two periodic drug tests thereafter, cooperating in the

4    collection of DNA, and making restitution in the amount of

5    $2,000 to the Architect of the Capitol, and the restitution

6    payment shall be payable to the Clerk of Court for the U.S.

7    District Court.

8         In addition, until the financial obligations are paid, and

9    that includes the fine that I mentioned of $25,000, you must

10   provide the Probation Office access to any requested financial

11   information and authorize the release of any financial

12   information.  The Probation Office may share that financial

13   information with the U.S. Attorney's Office.

14        I will not impose a computer search provision in this case,

15   given the nature of this offense did not involve computers until

16   after the fact.  There were certainly some ordering of goods on

17   the computer, but this is very different from a financial

18   computer fraud case.  So I'm not going to impose that condition.

19        I will impose a mental health condition, which I think will

20   aid in Mr. DeGrave's rehabilitation.

21        I think I've covered restitution.  It shall be paid at a

22   rate no less than $100 each month.

23        The Probation Office shall release the presentence

24   investigation report to all appropriate agencies, which includes

25   the Probation Office in the approved district, which is Nevada.

1    So I will transfer supervision of this case to Nevada, the

2    District of Nevada, but I will retain jurisdiction.

3        So Mr. DeGrave, if there are any alleged violations of

4    conditions of release, those will come back to me to be dealt

5    with here in this court.

6        Mr. DeGrave, I want you to understand that you do have the

7    right to appeal your conviction to the U.S. Court of Appeals for

8    the D.C. Circuit if you believe that your guilty plea was

9    somehow unlawful or involuntary or if there's some other

10   fundamental defect in the proceeding that was not waived in your

11   plea agreement.

12       Under some circumstances, a defendant also has a right to

13   appeal the sentence.  The defendant may waive that right as a

14   part of the plea agreement, however, and you have entered into a

15   plea agreement which waives some of your rights to appeal the

16   sentence itself.  Such waivers are generally enforceable, but if

17   you believe the waiver itself is not valid, you can present that

18   theory to the appellate court.

19       Also, under 28 U.S.C. Section 2255, you have the right to

20   challenge the conviction entered or the sentence imposed to the

21   extent permitted by that statute and your plea agreement.

22       Any notice of appeal must be filed within 14 days of entry

23   of judgment or within 14 days of any appeal by the government.

24       If you're unable to afford the cost of appeal, you may

25   request permission from the Court to file an appeal without cost

1    to you, and on appeal, you may also perhaps apply for court-

2    appointed counsel.

3         Are there any objections before I order that this sentence

4    be imposed?  Ms. Arco?

5              MS. ARCO:  Your Honor, I'm sorry if I spaced at the

6    moment.  I heard you say restitution.  But was it the $2,000

7    that the parties had agreed to?

8              THE COURT:  Yes.  I'm sorry if I didn't state that as

9    a part of the formal sentence.  It's $2,000 with $100 payments.

10        Anything, Mr. Shipley?  Is there a recommendation as to

11   where Mr. DeGrave serve his time?

12             MR. SHIPLEY:  Your Honor, we would ask for FCI

13   Victorville in Los Angeles.  There's no facility in Nevada.

14             THE COURT:  Okay.  Is there any objection to the

15   sentence as announced?

16             MR. SHIPLEY:  No.

17             THE COURT:  All right.  Any objection from Probation?

18             PROBATION OFFICER:  Your Honor, no objections.

19        With regard to voluntary surrender, is the Court granting

20   Mr. DeGrave to self-surrender?

21             THE COURT:  Yes.  Any objection from the government?

22             MS. ARCO:  No, Your Honor.

23             THE COURT:  I think it's appropriate.  With the

24   exception of his one recent violation, which I am confident he

25   won't do again, I think he can self-surrender.

1          PROBATION OFFICER:  Thank you, Your Honor.

2          THE COURT:  Anything else?  Oh, the motion to dismiss

3     the remaining counts?

4          MS. ARCO:  We move to dismiss the remaining counts in

5     the superseding indictment.

6          THE COURT:  All right.  Without objection, I will

7     grant that motion.

8       Anything else?

9          COURTROOM DEPUTY:  Re-entry?

10         THE COURT:  I am not imposing a re-entry hearing in

11    this case because the case will be in Nevada.

12         COURTROOM DEPUTY:  And about the potential interest

13    for the fine and the restitution?

14         THE COURT:  I'm not waiving them.

15       All right.  Anything else, Mr. Shipley?

16         MR. SHIPLEY:  Nothing for the defense.

17         THE COURT:  All right.  Thank you, all.

18       (Proceedings concluded at 12:32 p.m.)

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick_____              August 14, 2023_____

SIGNATURE OF COURT REPORTER              DATE